UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DASHEME KAREME HOSLEY, | Case No. 1:15-cv-01374-LJO-JDP |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS |
| v. | |
| SUZANNE M. PEERY, | ECF No. 1 |
| Respondent. | OBJECTIONS, IF ANY, DUE IN FOURTEEN (14) DAYS |

Dasheme Kareme Hosley is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Hosley raises the following claims for relief: (1) prosecutorial misconduct; (2) improper jury instructions; (3) prejudicial error to post extra security near petitioner during his live testimony; (4) cumulative error; and (5) erroneous denial of post-verdict motion to substitute counsel. ECF No. 1. For the reasons discussed below, we recommend that the court deny the petition.

# I.    FACTS[1]

PROSECUTION EVIDENCE

As of 2008, defendant's mother, Carol Harris, was married to Karl Johnson.  The couple resided at a house in the 2900 block of Lincoln Oak in Modesto.  Harris was the pastor of a church in Oakland.  She often discussed her own life story in her preaching.  According to what she said, she overcame a history of drug use and prostitution.  During that period of her life, which was when she was raising defendant, she shot and killed her husband (defendant's father) to protect herself from domestic violence.  The shooting took place in front of her children, and was very traumatic for them.

On the night of August 29 to August 30, Robert Barnes, Harris, Johnson, Harris's best friend, and Harris's mother, drove from Oakland to the Modesto house.  Once there, they started to play dominoes.  At first, the mood was good.  As time passed, however, tension developed between Harris and Johnson.

Barnes spent about an hour and a half on the front porch, talking on a cell phone.  During that time, he heard Harris and Johnson arguing.  At one point, Johnson came outside and asked Barnes for a cigarette.  Barnes could tell he was upset.  Johnson then went back inside. Barnes heard Harris say something like, "You want to challenge me?"  Then she turned over a coffee table in the front living room and threw it at Johnson.  Johnson tried to block himself from the table and candlestick holder coming at him, then he grabbed Harris with both hands on her upper bicep area near the shoulders and sat her forcefully down on the couch in the living room.  She got up swinging with closed fists, and Johnson did it again.  He was saying, "Is this what you want me to do?  Is this what you want me to do?"

Barnes came inside and asked Johnson what was going on.  Johnson never swung at or hit Harris in Barnes's presence, but merely sat her on the couch. Johnson asked for the keys to his car so he could leave.  Harris refused.

Harris went upstairs to her room.  A short time later, Barnes heard her on her cell phone, saying she was "this little bitty old woman and this big old man is over here beating on her."  She said she was afraid for her life.  At some point, Harris told Johnson, "That's all right," "I called my son, and he'll handle this." Johnson responded, "I don't give a fuck," and "Call your mother fucking son. I'm waiting." Johnson, who did not act scared of defendant, asked, "What was he

---

[1] The court relies on the California Court of Appeal's May 20, 2014 opinion for this summary of the facts of the crime.  *People v. Hosley*, No. F065500, 2014 WL 2112698, at *1-9 (Cal. Ct. App. May 20, 2014), *as modified on denial of reh'g* (June 4, 2014) (unpublished).  Where initial statement of facts is drawn from the state appellate court's decision, it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence.  *See Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)). Hosley does not allege that these preliminary facts are erroneous.

gonna do, shoot me? I'll shoot him back. What's he gonna do, stab me? I'll stab him back. But he ain't gonna beat my mother fucking ass." Johnson had a box cutter tucked in his shorts.

Barnes heard Harris speaking on the phone to Alfred Newton, a close family friend. Harris kept saying, "I know. I know[,]" and that she could not get on "his" line because the phone was off. Barnes thought defendant was coming to the house. Concerned about the potential for violence, Barnes told Harris she had "fucked up" and needed to get on the phone and tell defendant not to come. She said she knew, and she tried to call, but defendant's phone was off.

In 2008, Desamona Crowder was involved in an on-again, off-again relationship with defendant, with whom she had a child. Defendant and Alisia Brown stayed in a residence in San Leandro, and Crowder also stayed there a few times.

On the night of August 29 to 30, defendant, Crowder, Crowder's daughter, Brown, and Lamar Vincent were "[h]anging out" at the San Leandro residence. Everyone except Brown was ingesting cocaine. At some point during the evening (Crowder believed it was sometime between 10:00 p.m. and 1:00 a.m.), defendant received a call from Harris. He told Crowder that Harris was crying and said she and Johnson had gotten into an argument.

After the telephone call, defendant kept trying to call Harris back, but he was unable to reach her. He grew irritated and frustrated, wondering why she called, crying, and suddenly could not answer her phone. About 30 minutes after Harris called, defendant told Crowder he wanted to go to Modesto to check on her. Crowder did not have a car, so she texted George Willoughby that "something went down." She added "911" to indicate it was an emergency.

Willoughby left his job sometime after 1:00 a.m. and drove to the San Leandro residence. Defendant told him that Johnson had hit Harris. When defendant, Crowder, and Vincent got into his car, Willoughby assumed they were going to the house to get Johnson "off" Harris, although he had never known Johnson to be violent and had only rarely heard him raise his voice to Harris. He knew Harris had shot defendant's father in front of defendant, and that it had had a profound effect on defendant, who was extremely protective of Harris.

During the drive to Modesto, those in the car were upset Harris had been hit. Crowder saw defendant spin the cylinder of, and dry fire, a silver revolver. Willoughby saw defendant going through different caliber bullets he had in his sock and putting about six in the gun. Willoughby thought they were going to fight Johnson and defendant would be the first person to hit him, but believed defendant was just going to use the gun to scare Johnson.

At some point after Harris telephoned him, but (according to Crowder's recollection) before the shooting, defendant said to Crowder, "Why did she call me and tell me this? What did she think I was going to do?" Crowder also

recalled someone in the car receiving a call from Harris, saying that things had worked out and it was "just a gin night." In addition, defendant received a call from Barnes, who tried to convince defendant that everything was okay and not to come to Modesto.

Willoughby, a fast driver, estimated it took about 30 minutes to get from San Leandro to Modesto. When they arrived at Harris's house, Willoughby parked at the curb in front of the house. According to Crowder, the house was dark. According to Willoughby, however, the front porch and stairwell lights were on.

According to Barnes, he, Johnson, Harris, and Harris's friend were upstairs in the master bedroom, discussing a class Harris had to teach at church the next day, when Johnson said it sounded like someone was at the door. Harris told Johnson, "You bad. Go answer it." Johnson went to answer the door, and Harris left the room 10 or 20 seconds later. Barnes went to the window and called down, "It's not that serious, you know, you need [to] go home."

When Johnson opened the door, Barnes heard him say, "No, no, no." Barnes heard a gunshot and saw a flash. Barnes went downstairs. He saw blood at the bottom step that led through to the back living room and kitchen. Johnson was lying on the carpet and the linoleum. He was bleeding from the stomach area. He and Harris professed their love for each other, then Johnson fell silent. Barnes got some towels to hold against his wound, then called 911. Harris told him not to say Johnson had been shot.

Crowder recalled that she got out of the car and rang the doorbell, then, when nobody answered, the others got out of the car. Willoughby and Vincent remained near the vehicle, but defendant went up to the doorway and knocked on the window next to the door. Crowder and defendant remained in the doorway for about five minutes, then Johnson opened the door and asked defendant, "What's up?" Crowder did not see anything in his hands. Defendant responded, "What do you mean?" Although his voice was calm, he appeared shocked that Johnson answered the door instead of Harris. Johnson raised his hands with his fists closed, although he did not swing at defendant. Crowder did not see defendant pull anything from his pocket or see anything in his hand, but she saw a flash in between defendant and Johnson. Johnson was in the doorway; defendant was outside the house. Johnson fell backwards, about three feet inside the house. He said he did not want to die and he pleaded with defendant not to kill him. Johnson was sitting on the floor, slumped against the couch and holding his stomach. Crowder then saw defendant holding the gun he had previously had in the car. He was pointing it at Johnson's face. Defendant was about a foot away from Johnson. Harris came down the stairs, screaming and crying. She pushed defendant away from Johnson.

Crowder urged defendant to leave, then ran to the car. Willoughby was already in the driver's seat, and the others got in. The group returned to San Leandro, stopping only at a gas station on the way. Defendant talked to his

brother and told him what had happened, and that Johnson was still alive when they left. When they arrived at the San Leandro apartment, Brown, defendant's brother, and some other people were there. Defendant's brother was drunk and laughing about what happened. Crowder told police defendant was not happy about this. He said several times that he hoped Harris did not move Johnson, because the bullet would move and might kill him. Crowder also told police defendant said he did not want to kill Johnson, just mark him with a bullet.

According to Willoughby, defendant got out of the car first and went to the front door, and the others followed. Defendant rang the doorbell, then, when no one answered, started knocking. He was angry and upset that it was taking so long to get to his mother. When Johnson finally answered the door, he seemed kind of upset and asked what they were doing there. Defendant responded that it was because Johnson hit Harris.

Defendant stepped into the tile entryway just inside the door. He started yelling, and Johnson tried to say he did not do anything. Defendant took "a defensive stance," with one leg somewhat in front of the other and his shoulder to the side a bit. Johnson started to back up, and defendant took a couple steps forward. Johnson begged defendant not to kill him, then Willoughby "instantly" heard a single pop, and everybody ran back to the car. Willoughby was in the driver's seat; defendant got in front, and Crowder and Vincent sat in the back. Defendant turned around and asked Crowder and Vincent which one of them was going to be the one to "fold" (tell). Defendant still had the gun in his hand and was waving it back and forth with it pointed at Crowder and Vincent.

On the way out of Modesto, defendant received a phone call. Willoughby believed it was from Harris. Defendant also talked to his brother at some point. The mood inside the car was fairly upbeat.

According to Vincent, he thought the most that would happen that night was a fight. When Johnson answered the door, however, defendant "plunged" into the foyer and pushed Johnson. Johnson pushed back. He was asking what was going on and trying to get into a fighting stance to defend himself. Vincent did not see anything in Johnson's hands. Defendant told Johnson that Johnson knew what he was there for, and that Johnson was beating on defendant's mother. A revolver then appeared from defendant's right side. Johnson looked stunned and begged defendant not to shoot, but defendant pointed the gun at Johnson's chest and fired. Johnson grabbed his chest and went to his knees. Defendant then pointed the gun at Johnson's head and pulled the trigger again, but the gun jammed. Vincent saw Harris running downstairs at this point. She said they had better all get out of there, so they all got in the car and left.

Once inside the car, defendant waved the gun around and said they all had better not say anything. At one point on the drive back to the Bay Area, Harris called to relate that Johnson was fighting for his life. She later called again and asked why they came out there. Defendant basically replied, "Well, you called me to come out here, you knew what was gonna happen when I came out here."

5

The mood in the car was somber.

At approximately 4:47 a.m. on August 30, Modesto Police Officer Beavers and Sergeant Van Diemen were dispatched to Harris's house in response to a report of a shooting. When they arrived, the front door was open, but no one was outside. Upon entry into the living room area, Beavers saw Johnson lying on the floor in the kitchen area with Harris sitting next to him. Johnson had a gunshot wound to his right bicep and a gunshot wound to the right side of his chest. Although conscious, Johnson did not respond to officers' questions. Harris said Johnson had answered the door and been shot; however, officers did not observe any blood at the front door or leading from the front door to the couch, which was 10 to 15 feet away. There was blood on the seat cushions of the couch, however.

Detective Stanfield had contact with Harris at the hospital. He observed no injuries on her person or any indication she had been involved in an altercation.

At the time of his death, Johnson was 39 years old, stood six feet tall, and weighed 270 pounds. His blood-alcohol level was 0.14 percent. An autopsy revealed a bullet entered the right side of his abdomen. The bullet penetrated the liver, large intestine, mesentery, and abdominal aorta, and was lodged in the left lower quadrant of the abdomen. Its trajectory was from right to left, front to back, and slightly downward. There was also a through-and-through bullet wound to Johnson's right arm, just above the elbow. If Johnson had his arms up in a defensive manner, it was possible he was shot through the arm and into the chest. There were no other wounds or bruising to suggest he had been involved in a physical altercation. The cause of death was extensive loss of blood due to gunshot wounds to the abdomen and right upper arm.

On August 31, defendant texted Deniella Ojeda and asked her to call Harris and check on her. Defendant said Harris's husband had been killed in a home invasion. Later that night, when defendant and Ojeda were alone, defendant related that Harris had called him and said Johnson put his hands on her. Defendant said he went down there and walked in and just shot Johnson. Defendant said Johnson asked defendant not to shoot before defendant fired.

DEFENSE EVIDENCE

Defendant testified that his memories of Harris and his father were "parties or violence." When defendant was three or four years old, Harris killed defendant's father. There was an argument; Harris grabbed defendant, then defendant's father started hitting her with part of the vacuum cleaner hose. Defendant was in Harris's arms, and she and he fell to the ground. They crawled to the closet and tried to close the door, but defendant's father opened it. Defendant then heard shots and his father fell back. Defendant witnessed incidents of violence his "whole life," including other instances of domestic violence between his mother and men with whom she was involved after the

6

death of defendant's father.

When defendant was about four years old, Harris had a baby who died in his sleep. It seemed as if Harris blamed defendant and thought it was his fault, so he felt bad. Defendant always reacted to the reactions of the people around him. If his mother had a strong reaction or was not happy, then defendant could not be happy.

Defendant lived primarily with his grandparents after Harris killed his father, although he spent time with his mother when he could. Sometimes he had to sneak away to be with her. When he was about seven years old, his mother and boyfriend were fighting, and his mother was losing. Defendant tried to help her, but the door to her room was locked. Finally the boyfriend came out and pushed defendant down. Defendant went to his mother, thinking he would nurse her back to health like usual, but this time she pushed him away. He hit his head on the dresser and "bust[ed]" his head open, but he did not think Harris tried to do that on purpose. She hurt him because he let her down when he could not get in the room. She cussed him out and whipped him and told him that if he could not help her, he was no good. Defendant promised her that he would never let anybody else hurt her. Defendant's grandfather took defendant to the hospital. Defendant's grandparents did not want him to be with Harris anymore after the incident, but Harris was defendant's mother and he loved her.

On the evening of August 29 and early morning of August 30, defendant was "[k]ickin' it"—"[d]rinkin', smokin', snortin', poppin' "—with Vincent, Crowder, Brown, and his "partna Q," who was "[j]ust one of [defendant's] fools." Defendant estimated it was probably his fourth day without sleep. At some point (by which time Q had left), Harris telephoned. She was hysterical and crying about how "he" put his hands on her or she was getting beaten or something. Defendant could not understand everything she was saying. He had heard her in fights before; she took care of herself. He had never heard her so helpless. Harris did not ask defendant to come and do anything; she knew if she was in trouble, he was going to come. Defendant was raised so that nobody was going to hurt someone he loved, and he was going to do whatever he had to do to protect his family.

As soon as he got off the phone, defendant told Crowder to call Willoughby. When Willoughby arrived, defendant, Crowder, and Vincent got into Willoughby's car and headed for Modesto. Defendant wanted to check on his mother and make sure she was all right, because she needed him. He had a revolver.

On the drive to Modesto, defendant tried to think "how [he] would play it out." He did not know how it got to the point that Harris called him. He was not going to the Modesto house to shoot anyone, but was anxious and trying to figure out what was going on. He contacted Newton to try to find out how Harris was, but Newton just brushed him off. Newton refused to go check on Harris, but never suggested she was okay. His attitude angered defendant, because Newton

7

was in Stockton already and, thus, much closer to Harris's house than defendant, and Newton usually did not have a problem helping Harris. Because he was angry, defendant either turned off his phone or handed it over to Crowder.

The music in the car was loud, and defendant was doing drugs. He knew the gun was loaded. Everyone in the car was trying to figure out what happened to make Harris call defendant like she did, because she had never called him in that state. Plus, defendant knew Johnson, who was "[not] even like that." Defendant considered Johnson "cool"; they had a very good relationship. Defendant had neither seen Johnson strike Harris nor himself had a physical fight with Johnson, and he had never heard of Johnson hitting Harris. Johnson did not carry a gun and was pleasant to be around. He did not have the kind of personality that would engage in violence. Defendant was not expecting a fight with Johnson; Johnson would not challenge defendant like that. Defendant and Johnson sometimes got high together, so defendant knew what Johnson was like even under the influence of drugs.

Willoughby drove fast—the way he always drove—on the way to Modesto. During the drive, nobody in the car ever told defendant Harris had called and said she was all right, or that it was just a gin night. When they pulled up to the house, defendant jumped out and knocked on the door. Nobody answered. He knocked on the window and looked in, but could not really see because the lights were off. He knocked on the door again. Barnes did not yell at him from the window. Eventually, everyone else got out of the car and came up behind defendant. Defendant was anxious; he wanted to see his mother.

After about five minutes, Johnson opened the door. Defendant was shocked, as he was expecting to see his mother. He wondered why Johnson answered the door, and asked him what was happening. Johnson's demeanor was unusual; he was kind of hostile and standoffish, and he asked defendant what he was doing there. Defendant asked where his mother was, and Johnson replied that she was all right. Johnson asked again what defendant was doing there, and said it had nothing to do with defendant. Defendant, who did not have a gun in his hand, tried to push past Johnson to see his mother. Johnson blocked the doorway, and defendant told him to back up. Johnson then pushed defendant, who pushed back. Johnson was reaching, trying to grab something (defendant did not know whether it was defendant or the gun), and then defendant heard the shot. Defendant thought he pushed Johnson or hit him with the gun. He did not remember pulling the gun out of his waistband, but thought he may have grabbed it because Johnson was trying to grab it. Johnson never begged for his life, although he did ask defendant why defendant shot him. Defendant did not know what to say, but was going to try to help Johnson. Then Harris came down the stairs, however, and said, "Go, go, go." Defendant told her not to move Johnson because he was afraid the bullet could move, but she told defendant to go, asked what he did, and told him again to get out.

Defendant denied intending to shoot or kill Johnson. He just wanted to see his mother and make sure she was all right. He did not even know he shot

8

Johnson at first. Defendant had thought he would check on Harris, then he and Johnson would run off like other times when Johnson and Harris fought.

On the way back, the mood in the car was quiet. Defendant felt confused. He denied waving the gun around or threatening anyone. During the drive, he received a call from his mother, saying that Johnson was still alive and on his way to the hospital. Defendant learned Johnson had died an hour or two after the shooting. He felt "hollow."

Dr. Debbara Monroe, a licensed psychologist who specialized in early childhood developmental disorders and who had performed attachment and bonding studies for parents and children going through dependency cases and custody issues, examined defendant. Her examination involved interviewing him twice in August 2011 for about two hours each time, interviewing his brother, and reviewing documents from Harris, records from Children's Hospital in Oakland, and much of the discovery in this case. As a result, she formed the opinion that his history, exposure to trauma, and lack of healthy attachment figure warranted childhood diagnoses of reactive attachment disorder and post-traumatic stress disorder (PTSD). As an adult, defendant suffered from the effects of those disorders, and the results of what he suffered in childhood contributed to his adult behaviors.

Monroe diagnosed defendant as having PTSD in 2008. She also found him to show symptoms of dissociative disorder that impacted his behavior. She placed him in the category of dissociative disorder, not otherwise specified (NOS). Monroe believed defendant exhibited this disorder at an early age and was clearly suffering from it as an adult. Her primary diagnosis for adulthood was dissociative disorder NOS, with defendant still suffering from symptoms of PTSD.

Monroe explained that traumatic events affect brain development in young children. Levels of heightened anxiety can be indelibly marked in the brain, so that such an individual develops hyperaroused reactions and hyper states of anxiety. These continue to affect the child as he or she develops into adulthood.

Particularly from her interviews with defendant, Monroe concluded Harris put defendant in the role of being her partner. She put responsibility on him to take care of her, and he felt it was his role to make sure she was okay. The incident in which his head was cut caused him to feel his charge in life was to make sure his mother was okay.

In his interviews with Monroe, defendant described the telephone call he received from Harris on August 30 as an event where again he was terrified about his mother's safety and felt he desperately needed to get to her to find out if she was all right. In Monroe's opinion, Newton's refusal to help caused defendant to feel even more desperate and anxious about getting to his mother. Then, the similarity between Johnson blocking the door to defendant and at least two other major traumatic events in defendant's life could have triggered in defendant a

reaction "coming from a place of complete desperation, fear, and needing to get to his mother" to make sure she was all right.

Monroe explained that a reaction based on past trauma can create moments in which there is a lot of confusion, and the person's perception of what is going on can be temporarily blocked. There can even be periods of blackout. Defendant's testimony about not remembering pulling or shooting the gun was consistent with a dissociative disorder and blacking out.

Monroe opined that defendant's following his mother's orders to leave when, after the shooting, he wanted to stay and try to help Johnson, was consistent with defendant's attachment disorder. Monroe believed the unhealthy attachment defendant had with Harris, which developed early in childhood, still affected defendant today, and would affect him in such a situation.

## II.    CRIMINAL CONVICTION AND APPEALS

Petitioner Dasheme Kareme Hosley was convicted on July 10, 2012 by a jury in the Superior Court of Stanislaus County, Case No. 1251412, of premeditated murder, during the commission of which he personally used a firearm, and personally and intentionally discharged a firearm, proximately causing death.[2] *See People v. Hosley*, No. F065500, 2014 WL 2112698, at *1 (Cal. Ct. App. May 20, 2014), *as modified on denial of reh'g* (June 4, 2014) (unpublished) (citing Cal. Pen. Code §§ 187(a), 12022.5(a), 12022.53(d)). Hosley was sentenced to a term of five years plus 75 years to life following a bifurcated trial. *See id.*

On May 20, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment. *See id.* The California Supreme Court summarily denied the petition for review on August 20, 2014. LD[3] 23. Hosley then filed the instant federal petition for a writ of habeas corpus. ECF No. 1. Respondent has filed an answer to the petition, ECF No. 20, and Hosley has filed a reply, ECF No. 22. Hosley's petition is now before the court.

---

[2] Hosley's mother, Carol Harris, was jointly charged with defendant, but their trials were severed. *See Hosley*, 2014 WL 2112698, at *1 n.1. Hosley's brother, Deleon, and Alisia Brown were charged as accessories. *See id.*

[3] "LD" refers to the documents lodged by respondent on January 15, 2016. ECF No. 21.

# III.     STANDARD OF REVIEW

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003).  To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The standard for reviewing the state court's decision varies depending on whether the state court decided petitioner's claims on the merits.

When a state court has decided a petitioner's claims on the merits, a federal court reviews the state court's decision under § 2254(d)'s deferential standard.  Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts.  *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018).  A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted).  The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011).  An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016).  Further, a federal habeas court has an obligation to consider arguments or theories that "could have supported a state court's decision." *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2557 (2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

Even when a state court does not explicitly address a petitioner's claims on the merits, a state prisoner still must satisfy a demanding standard to obtain habeas corpus relief. When a state court gives no reason for denying a petitioner's habeas claim, a rebuttable presumption arises that the state court decided the claim on the merits under § 2254(d). *See Richter*, 562 U.S. at 99. And a federal habeas court's obligation to consider arguments or theories that could support a state court's decision extends to state-court decisions that contain no reasoning at all. *See Sexton*, 138 S. Ct. at 2557. If a state court denies a petitioner's habeas claim solely on a procedural ground, then § 2254(d)'s deferential standard does not apply, *see Visciotti v. Martel*, 862 F.3d 749, 760 (9th Cir. 2016), but the petitioner faces another hurdle: if the state court's decision relies on a state procedural rule that is "firmly established and regularly followed," the petitioner has procedurally defaulted on his claim and cannot pursue habeas relief in federal court unless he shows why the federal court should excuse his procedural default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016); *accord Runningeagle v. Ryan*, 825 F.3d 970, 978-79 (9th Cir. 2016). If the petitioner has not pursued his habeas claim in state court at all, the claim is subject to dismissal for failure to exhaust state-court remedies. *See Murray v. Schriro*, 882 F.3d 778, 807 (9th Cir. 2018). A federal habeas court reviews a state court's decision de novo only in limited circumstances, namely when the decision does not pass muster even under § 2254(d)'s deferential standard or when the state court has not decided a petitioner's claim at all. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

Finally, one rule applies to all state prisoners' petitions under § 2254: the petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. If this standard is demanding, "that is because it was meant to be." *Id.* at 102. Federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id.* at 103 (citation omitted). The review serves as a "guard against *extreme*

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (emphasis added).

## IV. DISCUSSION

### A. Prosecutorial Misconduct

Hosley argues in grounds 1-3 of the petition that the prosecutor in his criminal trial violated his substantive due process rights by committing prosecutorial misconduct in the form of: (1) misrepresenting the law regarding second degree murder and imperfect self-defense in the closing argument; (2) referring to inadmissible statements from a letter written by Hosley's mother in the rebuttal closing argument; and (3) referring to Hosley's prior conviction for assault with a firearm. ECF No. 1 at 21-32. Respondent argues that the prosecutorial misconduct claim was reasonably rejected by the state court. ECF No. 20 at 21.

A prosecutor's improper comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Parker v. Matthews*, 567 U.S. 37, 45 (2012). As "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power,'" it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (citations omitted). "On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

Hosley raised his prosecutorial misconduct claims on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. *See Hosley*, 2014 WL 2112698, at *9-18. He also raised these claims in his petition for review, which the California Supreme Court summarily denied. LDs 22, 23. As federal courts review the last reasoned state-court opinion, the court will "look through" the summary denial and examine the decision of the California Court of Appeal. *See Brumfield v. Cain*, 135 S. Ct.

2269, 2276 (2015); *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).

### 1. Ground 1: Mispresenting the Law - Background

In denying the prosecutorial misconduct claim in ground 1 of the petition—the prosecutor's alleged misrepresentation of law regarding second degree murder and imperfect self-defense—the California Court of Appeal stated:

**A. Misrepresenting the Law**

Defendant says the prosecutor misrepresented the law concerning second degree murder and imperfect self-defense during closing arguments. Because the prosecutor's misstatements of the law related to elements and concepts that were crucial to the jury's determination of the correct homicide verdict, the argument runs, the misconduct violated defendant's federal constitutional right to a fair trial.

1. Background

The prosecution proceeded on the theory defendant was guilty of first degree, premeditated murder. Jurors were given a full range of lesser options, however: acquittal based on self-defense or defense of another, or on accident or misfortune; second degree, unpremeditated murder based on express or implied malice; voluntary manslaughter based on sudden quarrel or heat of passion; voluntary manslaughter based on imperfect self-defense or imperfect defense of another; and involuntary manslaughter.

During her initial closing argument, the prosecutor stated portions of the applicable law, and why, in her view, jurors should find intent to kill and premeditation and so return a guilty verdict on the charge of first degree murder. During her discussion of the lesser-included-offense options, the following took place:

"[PROSECUTOR]: This case is a first degree murder case. The evidence in this case will prove that it's ... not a second degree murder case.

"Second degree is under an implied malice theory as opposed to express malice, and that is an intentional act dangerous to life with conscious disregard ... for the life. That's the act, that's the intent at the time.

"But this case, the facts demonstrate that [defendant] harbor—

"[DEFENSE COUNSEL]: Objection, Your Honor. She's misstating the law. Second degree murder can be either, A, implied malice, or express malice. Either one, they can be second degree murder.

"THE COURT: [Prosecutor]?

"[PROSECUTOR]: You will not need this verdict form because this is a first degree, premeditated, deliberated murder.

"Voluntary manslaughter is another verdict form you're going to receive, and that is where there is no malice, it's the finding of no malice harbored by the defendant in the case. In that scenario, the killing occurred in self-defense because the defendant believed he was in imminent danger or because he believed it was a defense of others because he believed that person was in imminent danger.

14

"Now, the key word here is imminent, ladies and gentlemen. Imminent means now. There is no evidence to demonstrate that [Harris] was in danger at the time that [defendant] answered [sic ] the door and fired the gun at [Johnson].... [¶] ... [¶]

"And the use of force that's necessary to defend against the danger. There is no evidence in this case to suggest that the use of force in him shooting [Johnson] was necessary to prevent any imminent danger. And because of that, ladies and gentlemen, you also must believe that that belief is reasonable, it's unreasonable in light of all the facts laid out before you—

"[DEFENSE COUNSEL]: Objection, Your Honor. That is not the law. Unreasonable beliefs can support voluntary manslaughter, that's simply wrong.

"THE COURT: [Defense counsel], I'll give you an opportunity.

"[DEFENSE COUNSEL]: I understand, Your Honor. But when she misstates the law, that needs to be pointed out, and I need to make an objection.

"[PROSECUTOR]: Judge, it says right in the instruction the belief must be reasonable.

"THE COURT: It's there. Go ahead, [prosecutor].

"[PROSECUTOR]: Because it is not a reasonable belief in this case, because of the evidence that you have before you, you can take that verdict form and set it to the side, because you are not going to need it. It's a first degree premeditated murder."

During his argument, defense counsel explained that intent to kill was not enough for murder, although it made the killing an unlawful homicide unless it was done in reasonable self-defense or reasonable defense of others. Defense counsel further told the jury:

"There is a second theory that the prosecution has the burden of proving did not exist. It is called imperfect self-defense or imperfect defense of others. Is a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. If you conclude the defendant acted in complete self-defense or in defense of another, his action was lawful, and you must find him not guilty of any crime. Self-defense is a justifiable homicide, you're not guilty.

"The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends upon whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense or imperfect defense of another if, one, the defendant actually believed that he or [Harris] was in imminent danger of being killed or suffering great bodily injury, and two, the defendant actually believed that imminent use of deadly force was necessary to defend against the danger, but at least one, at least one, it could be both, of those beliefs was unreasonable."

In her rebuttal, the prosecutor in part referred the jury to the instruction on self-defense, stating: "[I]t says the defendant acted in lawful self-defense or defense of another if, one, the defendant reasonably believed that [Harris] was in imminent danger of being killed or suffering great bodily injury, reasonably believed that the immediate use of deadly force was necessary to defend against the danger." This ensued:

"[PROSECUTOR:] And the last thing when he talks about manslaughter,

15

[defense counsel] is talking about two different kinds of manslaughter, he's talking about voluntary manslaughter and involuntary manslaughter—

"[DEFENSE COUNSEL]: If I might, Your Honor, that is an incorrect statement. That is a voluntary manslaughter, imperfect self-defense.

"THE COURT: Are you talking about her slide?

"[DEFENSE COUNSEL]: Yes, her slide incorrectly states—

"[PROSECUTOR]: You know, he's right. Actually, he's right. And I'll just correct that right now.

"THE COURT: Not your words, but your slide?

"[PROSECUTOR]: You know what? He's right. And I'm going to correct that right now. It should say invol—I mean vol. Excuse me. If I could just have a minute, folks.

"So voluntary manslaughter under ... CalCrim 571 is under imperfect self-defense. And, again, he doesn't meet the elements. Imminent danger of being killed or suffering great bodily injury. Who is in imminent danger here—

"[DEFENSE COUNSEL]: Again, Your Honor, that is furthermore wrong. It is at least one of those beliefs were unreasonable.

"THE COURT: Just so you folks know, I will be reading you the instructions, you will have a copy for you folks to look at. Part of the instructions does indicate if there's a discrepancy between what the attorneys say and my instructions that I read to you, you're to accept the instructions as they are read to you by me.

"[PROSECUTOR]: And the Judge is absolutely correct. Just go with what the instruction says.

"So let's talk about CalCrim 571, imperfect self-defense or defense of another. Again, the point is he doesn't meet the elements under this either, and that is imminent danger of being killed or suffering great bodily injury. [¶] ... [¶]

"And the second element is that the belief that deadly force was necessary to stop that from happening, and at least one of those beliefs was unreasonable. That's correct. Unreasonable. So I will change that slide as well. I just don't want to take the time to do it now. It is unreasonable, at least one of those beliefs.

"Well, all of those beliefs are unreasonable, and none of those elements have been met, because that's not what the facts support in the case...."

The court subsequently instructed the jury. In pertinent part, jurors were told—as they had been at the outset of trial—that nothing the attorneys said, including their opening statements and closing arguments, was evidence. Jurors were also told they must follow the law as the court explained it, and, if they believed the attorneys' comments on the law conflicted with the court's instructions, they must follow the court's instructions. The court fully instructed on the various theories of justifiable, excusable, and unlawful homicide. With respect to justifiable homicide based on self-defense or defense of another, the court instructed, in pertinent part, that defendant had to have reasonably believed Harris was in imminent danger of being killed or suffering great bodily injury, and he had to have reasonably believed the immediate use of deadly force was necessary to defend against that danger. With respect to murder, the court instructed that malice aforethought was required; proof of either express malice or implied malice was sufficient to establish the state of mind required for murder; defendant acted with express malice if he unlawfully intended to kill; and

defendant acted with implied malice if he intentionally committed an act, the natural and probable consequences of which were dangerous to human life, at the time he acted he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for human life.  The court instructed that defendant was guilty of first degree murder if the People proved he acted willfully, deliberately, and with premeditation, and it defined those terms.  Jurors were further instructed to consider provocation in deciding whether the crime was first or second degree murder, and in determining whether defendant committed murder or manslaughter.  The court instructed on voluntary manslaughter based on sudden quarrel or heat of passion, then told the jury:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.

"If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime.  The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense or imperfect defense of another if:

"One, the defendant actually believed that he or [Harris] was in imminent danger of being killed or suffering great bodily injury, and

"Two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger but;

"Three, at least one of those beliefs was unreasonable."

2. Analysis

It is improper for a prosecutor to misstate or misrepresent the law.  (*People v. Boyette* (2002) 29 Cal.4th 381, 435; *People v. Hill* (1998) 17 Cal.4th 800, 829; *People v. Bell* (1989) 49 Cal.3d 502, 538.)  In her remarks, the prosecutor erred by suggesting second degree murder could only be based on implied malice, and arguably insinuating express malice rendered a killing first degree murder.  (*See, e.g., People v. Gonzalez* (2012) 54 Cal.4th 643, 653; *People v. Nelson* (2011) 51 Cal.4th 198, 213; *People v. Knoller* (2007) 41 Cal.4th 139, 151; *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  She (and, initially, the trial court) also seems to have been confused either about which type of self-defense or defense of another (complete versus imperfect) she was arguing, or about when the law requires a defendant's beliefs to have been reasonable.  (*See, e.g., People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)

Any harm was cured by the trial court's correct instructions on the law, both with regard to second degree murder and voluntary manslaughter based on imperfect self-defense or defense of another.  "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]"  (*People v. Osband* (1996) 13 Cal.4th 622, 717.)  Here, the jury was expressly admonished

to follow the court's instructions if they conflicted with the attorneys' statements. (*See People v. Boyette, supra,*29 Cal.4th at p. 436.)

We recognize the trial court initially seemed to agree with the prosecutor that voluntary manslaughter requires a defendant's beliefs to be reasonable. We do not believe jurors would have focused on a brief remark while ignoring the extensive formal instructions given by the court on the subject. In light of those instructions and defense counsel's argument that correctly stated the law (and that also pointed out that, for purposes of imperfect self-defense or defense of another, either or both beliefs could be unreasonable), we find neither a reasonable probability a result more favorable to defendant would have been reached without the prosecutorial error nor a trial that was rendered fundamentally unfair thereby.

*Hosley*, 2014 WL 2112698, at *9-14.

### 2. *Ground 1: Misrepresenting the Law - Analysis*

It is not disputed that the prosecutor in Hosley's criminal trial misrepresented the law of second-degree murder and voluntary manslaughter based on imperfect self-defense or defense or another. *See id.* at *14; *see also* ECF No. 20 at 27. Both the California Court of Appeal and the respondent in this appeal reason that any harm by the prosecutor was cured when the jury was directed to follow the trial court's instruction rather than rely upon the attorneys' statements. *See Hosley*, 2014 WL 2112698, at *13. After the prosecutor's misstatements, the jury was properly instructed regarding malice, first-degree murder, second-degree murder, and voluntary manslaughter based on imperfect self-defense or defense of another. *See id.*

It is presumed that a jury follows its instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000), including curative instructions to disregard improper statements or evidence, *see Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987). These presumptions can be rebutted if the petitioner can demonstrate: (1) an "overwhelming probability" that the jury will be unable to follow the court's instruction; and (2) a strong likelihood that the effect of the improper statements or evidence would be "devastating" to the defendant. *See id.*

Hosley has not set forth any reason why the jury would have been unable to follow the curative instruction or why there is a strong likelihood that the effect of the prosecutor's misstatement was devastating to his defense. We cannot conclude from the record before us that the prosecutor's misstatements: (1) had a substantial and injurious effect or influence in

determining the jury's verdict, *see Brecht*, 507 U.S. at 637-38; or (2) rendered Hosley's criminal trial fundamentally unfair, *see Darden*, 477 U.S. at 181. Accordingly, we will recommend that ground 1 of the petition be denied. *See* 28 U.S.C. § 2254(d).

### 3. *Ground 2: Arguing Evidence for Impermissible Purpose - Background*

Desamona Crowder, who had a child and an on-off relationship with Hosley, testified at trial that she recalled someone in the car receiving a call from Hosley's mother before the shooting. *See Hosley,* 2014 WL 2112698, at *3. This evidence was relevant whether there was premeditation and deliberation to support a conviction for first-degree murder. According to Crowder, Hosley's mother stated before the fatal shooting that everything was fine and it was "just a gin night."[4] *Id.* However, there was also testimony at trial from Hosley and others that Hosley could not have received such a call because his phone was turned off. *See id.* at *2, 7.

During trial, a licensed psychologist, Dr. Debbara Monroe, testified as an expert in support of Hosley's defense. *See id.* at *8. Dr. Monroe opined that Hosley had suffered from hyperaroused reactions and hyper states of anxiety resulting from early childhood traumatic events involving his mother. *See id.* Hosley's testimony that he did not remember shooting Johnson was consistent with a dissociative disorder and blacking out, according to Dr. Monroe. *See id.* at *9. In forming her expert opinion, Dr. Monroe reviewed a letter and a separate statement written by Hosley's mother, who wrote that "she mistakenly telephoned defendant the night of the shooting; hearing his voice had a sobering effect; and three minutes later, she called him back and told him she was okay, that they were just drinking, and everything was fine." *Id.* at *14. This evidence was admitted for the limited purpose of supporting Dr. Monroe's expert opinion.

The prosecutor argued in her closing argument that the jury should convict Hosley of first-degree murder because was there was evidence that Hosley's mother called him prior to the shooting and told him "everything was fine, that it was just a gin night." *See id.* Hosley's

---

[4] The court infers that the phrase "gin night" means a night of heavy alcohol consumption.

defense counsel responded by arguing in closing argument that Crowder's testimony was unreliable and suggested that the second phone call from Hosley's mother may not have occurred prior to the shooting. *See id*.

In the rebuttal closing argument, the prosecutor attempted to establish that Hosley, in fact, received the phone call from his mother telling him everything was fine by referencing the letter written by Hosley's mother used by Dr. Monroe evaluated in forming her expert opinion. *See id*. at *15. Defense counsel objected that the letter was inadmissible for this purpose, but the trial court overruled the objection. *See id*.

During the next break (outside of the presence of the jury), defense counsel moved for a mistrial on the basis that the statements in the letter were only admissible for the limited purpose of supporting Dr. Monroe's expert opinion. *See id*. The trial court denied the motion, but instead, instructed the jury:

> During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.
>
> Debra [sic ] Monroe testified that in reaching her conclusions as an expert witness, she considered statements made by [defendant's mother] and [defendant's brother]. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true.

*Id*.

The California Court of Appeal denied relief on ground 2 and construed Hosley's argument as both a 6th Amendment confrontation clause and due process challenge, framing the issues as follows:

> "It is the long-standing rule in California that experts may rely upon and testify to the sources on which they base their opinions [citations], including hearsay of a type reasonably relied upon by professionals in the field. [Citations.] These rules apply to mental health experts. [Citation.] Hearsay relied upon by experts in formulating their opinions ... is not offered for the truth of the facts stated but merely as the basis for the expert's opinion. [Citations.]" (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747; *accord, People v. Hill* (2011) 191 Cal.App.4th 1104, 1128.) "[A] witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.)

It is improper for a prosecutor to obscure the limited purpose for which evidence was admitted. (*See People v. Clark* (1993) 5 Cal.4th 950, 1008, *disapproved on another ground in People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) The prosecutor did so here, and the trial court should have sustained defense counsel's objection. Nevertheless, we conclude defendant was not prejudiced.

"If a prosecutor's argument refers to extrajudicial statements not admitted at trial, the defendant may be denied his right under the Sixth Amendment to confrontation and cross-examination, thus requiring reversal of the judgment unless the court is satisfied beyond a reasonable doubt that the misconduct did not affect the verdict. [Citations.]" (*People v. Harris* (1989) 47 Cal.3d 1047, 1083, *disapproved on another ground in People v. Wheeler* (1992) 4 Cal.4th 284, 299, fn. 10; *see also People v. Bell, supra,* 49 Cal.3d at pp. 533-534.) In the present case, however, jurors were aware of what Harris had written for Monroe's use. Thus, the prosecutor did not essentially act as her own unsworn witness. Moreover, it is clear she was responding to defense counsel's argument. " 'Although the remarks of a defense counsel do not justify retaliation by the prosecution, such remarks must be considered in assessing the prejudicial effect of the prosecutorial misconduct.' [Citations.]" (*People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585.) Significantly (and, in our view, dispositively), although the trial court overruled the contemporaneous defense objection, it subsequently gave an express limiting instruction that was directed precisely to the evidence at issue. In addition, there was specific testimony, which was not limited in purpose, that at least two people tried to call defendant and were unable to make contact with him. Under the circumstances, we are satisfied the jury was not misled, or the verdict affected, by what occurred. (*See People v. Clark, supra,* 5 Cal.4th at p. 1009; *People v. Bell, supra,* 49 Cal.3d at pp. 534, 542.)

On appeal, defendant presents the alleged misconduct as a due process violation, rather than a violation of the confrontation clause. This does not change our conclusion. Although, as defendant points out, it has been held that a prosecutor's knowing presentation of false or misleading argument constitutes a due process violation (*e.g., People v. Morrison* (2004) 34 Cal.4th 698, 717), cases so holding present situations much different than what happened here. For instance, in *Miller v. Pate* (1967) 386 U.S. 1, 5-6, the prosecutor argued to the jury that stains on a pair of shorts were the victim's blood, while knowing they were actually paint. In *People v. Morrison, supra,* 34 Cal.4th at page 716, the defendant claimed a prosecution witness committed perjury, and the prosecutor knew the testimony was false but presented it anyway. In *People v. Sakarias* (2000) 22 Cal.4th 596, 632-633, the prosecutor knowingly argued inconsistent factual theories in the separate trials of coperpetrators. In *Brown v. Borg* (9th Cir.1991) 951 F.2d 1011, 1012, 1014-1015, the prosecution's theory was that the victim was killed when the defendant and an accomplice robbed him of his wallet and jewelry. The prosecutor failed to inform defense counsel those items in fact were not stolen, allowed a detective to testify to an opinion based in part on the allegedly stolen items, and argued to the jury the items were missing.

" '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' [Citation.]" (*In re Price* (2011) 51 Cal.4th 547, 560.) The prosecutor's response

to defense counsel's argument did not render defendant's trial unfair.

*Hosley*, 2014 WL 2112698, at *15-17.

#### 4.   Ground 2: Arguing Evidence for Impermissible Purpose - Analysis

The California Court of Appeal reasonably rejected Hosley's claim for relief on ground 2. It held that there was not a confrontation clause violation requiring reversal because Hosley was not prejudiced, and the jury verdict was not affected.  *See id.* at *16.  It further held that the prosecutor's response to defense counsel's argument did not render Hosley's criminal trial unfair and did not violate his right to due process.  *Id.* at *17.

Even though the prosecutor improperly obscured the purpose for which the statements in Hosley's mother's letter were admitted and the trial court should have sustained defense counsel's objection, the verdict was not affected because the trial court gave an appropriate curative instruction that the statements in the documents that Dr. Monroe reviewed to form her opinion could only be used for the limited purpose of evaluating the expert opinion.  Like ground 1 of the petition, it is presumed that the jury followed the trial court's instruction.  *See Weeks*, 528 U.S. at 234; *Greer*, 483 U.S. at 767 n.8.  There is no reason to believe that the jury was incapable of obeying the curative instruction or that there is a strong likelihood that the prosecutor's improper reference to the letter was "devastating" to Hosley's defense.  *See Greer*, 483 U.S. at 767 n.8 (noting that a jury is presumed to have followed a curative instruction "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, [] and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." (citations omitted)).

Thus, the court cannot conclude that the prosecutor's reference to a statement in Hosley's mother's letter for an improper purpose "had substantial and injurious effect or influence in determining the jury's verdict" so as to necessitate habeas relief.  *See Wood*, 693 F.3d at 1113 (quoting *Brecht*, 507 U.S. at 637-38).  Ground 2 of the petition should be denied.  *See* 28 U.S.C. § 2254(d).

*5. Ground 3: Misuse of Prior Conviction - Background*

In denying the prosecutorial misconduct claim in ground 3 of the petition—the prosecutor's misuse of Hosley's prior conviction in closing argument—the California Court of Appeal stated:

### C. Misusing Defendant's Prior Conviction

Defendant contends the prosecutor misused defendant's prior assault conviction. He claims the prosecutor argued a fact not in evidence (the conviction was for shooting someone) and used the conviction for an improper purpose (disposition instead of impeachment).

1. Background

On or about November 8, 2000, defendant was convicted in the Superior Court of Alameda County of assault with a firearm (§ 245, subd. (a)(2)). Prior to the current trial, the prosecutor sought the conviction's admission as relevant on the issues of intent and identity, as well as for impeachment. The trial court ruled the prior incident was too prejudicial to be admitted in the prosecution's case-in-chief, but might be relevant for impeachment should defendant testify, and also might become relevant depending on the defense expert's testimony. During defendant's testimony, the court confirmed the prosecutor could present the date, Penal Code section, title, and fact the offense was a felony. In keeping with the court's ruling, the prosecutor subsequently elicited from defendant that on November 8, 2000, he was convicted of a felony, specifically assault with a firearm on a person, in Alameda County.

During the prosecutor's closing argument, the following took place:

"[PROSECUTOR:] Post-traumatic stress disorder. I tried to nail [Monroe] down on this. Are you diagnosing him as a child or as an adult, okay? What are the diagnostic criteria for that? She says I'm diagnosing him as a child first. He witnessed a traumatic event, yes, he did....

"Persistent avoidance from things associated with that event. Well, that's violence, that's firearms, that's domestic violence. Where is he in his life avoiding any of those three things?

"You heard from Desamona Crowder that he beat her. You heard that he has a gun, he uses a gun, always carries a loaded gun....

"He's not avoiding the situations associated with the traumatic event, and he's certainly by virtue of the fact that he has been convicted of shooting somebody in the past and he shoots [Johnson]—

"[DEFENSE COUNSEL]: Objection, Your Honor.

"THE COURT: That misstates his prior.

"THE DEFENDANT: It misstates a lot of stuff.

"[PROSECUTOR]: He was convicted of assault with a firearm in the past, and he shot [Johnson], that he's not avoiding acts of violence.

"There's no avoidance. He doesn't meet the criteria for avoidance."

As previously stated, at the next break, defense counsel placed his mistrial motion on the record. As one of the grounds for a mistrial, defense counsel

pointed to the prosecutor's use of defendant's prior conviction to show defendant had assaulted people with firearms before. Counsel argued the evidence was inadmissible for that purpose. As soon as the jury returned to the courtroom, the court stated:

"And, folks, before I start reading you the instructions, during her rebuttal, her closing argument, [the prosecutor] referred to a prior conviction of [defendant]. And I'll ask you to disregard that as part of her argument.

"And I will read you an instruction that I will read later on.... And this has to do with the credibility of witnesses and prior convictions.

"And the instruction reads:

"If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness'[s] testimony. The fact of a conviction does not necessarily destroy or impair a witness'[s] credibility. It's up to you to decide the weight of that fact and whether that fact makes a witness less believable.

"If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness'[s] testimony. The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness'[s] credibility. It's up to you to decide the weight of that fact and whether that fact makes the witness less believable.

"So, again, that portion of the instructions goes to the fact that a prior conviction may be considered only as to credibility of a witness'[s] testimony."

The court repeated the instruction during the reading of the instructions as a whole.

2. Analysis

A prosecutor commits misconduct by referring, in closing argument, to facts not in evidence. (*People v. Hill, supra*, 17 Cal.4th at pp. 828-829.) When a defendant's prior conviction has been admitted solely for impeachment purposes, a prosecutor errs by relying on it to argue the defendant's predisposition to commit a crime. (*See People v. Collins* (2010) 49 Cal.4th 175, 211, 213; *cf. People v. Friend* (2009) 47 Cal.4th 1, 33.)

When the prosecutor's argument here is considered in context, we do not find it reasonably likely jurors construed her remarks as suggesting defendant should or could be convicted based on his criminal propensity or predisposition to commit a crime. However, the prosecutor should have refrained from arguing defendant had been convicted of shooting someone in the past and from using his prior conviction for a purpose other than impeachment.

Nevertheless, any misconduct was harmless. The trial court promptly intervened. Not long after, it admonished jurors to disregard the offending portion of the prosecutor's argument, and it repeatedly instructed the jury that a prior conviction could only be considered in evaluating credibility. The admonitions cured any harm, particularly in light of extensive evidence unrelated to defendant's prior conviction (including defendant's own testimony) that defendant habitually carried a gun and could be violent. (*See, e.g., People v. Collins, supra*, 49 Cal.4th at p. 209; *People v. Friend, supra*, 47 Cal.4th at p. 40; *People v. Dykes* (2009) 46 Cal.4th 731, 774; *People v. Harrison* (2005) 35 Cal.4th

208, 246.)

*Hosley*, 2014 WL 2112698, at *17-18.

### 6. *Ground 3: Analysis*

The California Court of Appeal reasonably rejected Hosley's claim for relief from his conviction in ground 3. Although Hosley's prior conviction was admitted solely for impeachment purposes, the prosecutor improperly referred to the conviction for another purpose—as evidence that Hosley is not persistently avoiding things associated with a prior traumatic event, as diagnosed by Dr. Monroe. The prosecutor's error did not have a substantial and injurious effect or influence on the jury's verdict because the trial court immediately took corrective action to cure any harm to Hosley by issuing curative instructions to the jury that Hosley's conviction could only be used to evaluate his credibility. *See Brecht*, 507 U.S. at 637-38. Therefore, we will recommend that habeas relief as to ground 3 of the petition be denied. *See* 28 U.S.C. § 2254(d).

## B. Instructional Errors

Hosley argues in grounds 4 and 5 that his constitutional right to a fair trial was violated when the trial court gave erroneous jury instructions concerning: (1) mental disorder evidence (CALCRIM No. 3428); and (2) mental state of deliberation and premeditation (CALCRIM No. 225). ECF No. 1 at 33-39. Respondent argues that Hosley's claims were reasonably rejected by the state appellate court and there was no violation of due process caused by any of the alleged instructional errors. ECF No. 20 at 35.

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules . . . .")). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997)

(citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack of state-court jury instructions, a petitioner must do more that prove that the instruction was erroneous. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Id*. If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *See O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

A federal court's review of a claim of instructional error is highly deferential. *See Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. *See id*. The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *See Henderson*, 431 U.S. at 157.

### 1. Ground 4: CALCRIM No. 3428 - Background

In denying the instructional error claim in ground 4 of the petition concerning CALCRIM No. 3428, the California Court of Appeal stated:

> **B. CALCRIM No. 3428**
> Defendant says the trial court also erred by wording CALCRIM No. 3428 in a manner that wrongly conveyed the notion mental disorder evidence was limited to the issue of specific intent to kill. Because such evidence was also relevant to the issue of deliberation and premeditation, he says, the error violated his Fourteenth Amendment right "to a fair determination of whether he deliberated and premeditated the killing."
>
> 1. Background
> As previously described, the defense presented expert testimony supporting a mental state defense, in an attempt to show defendant acted without deliberation and premeditation in killing Johnson. In his summation, defense counsel observed that if a killing was done without a legally valid excuse or justification, the killing was unlawful and, depending on the circumstances, the person was

guilty of either murder or manslaughter. Defense counsel told jurors it would be up to them to decide of which crime defendant might be guilty, and he noted: "That's why this evidence concerning his brain and the abuse he suffered is extremely relevant as to what crime he in fact committed. It's the law."

Defense counsel further argued Johnson committed a provocative act when, although he knew defendant was coming to find out if Harris was all right, Johnson told defendant it was none of his business and to get out of there. Counsel told the jury:

"You go to go visit your momma who you think was beaten, and he's saying, 'None of your blankety-blank business,' and obstructs the door. That is enough to provoke reasonable people into acting without the usual reasonableness, because you gotta find out. It's your momma....

"The way [defendant's] brain is wired, you may as well hit him over the head with a two-by-four. But it isn't just because he's wired that way, ladies and gentlemen. Any reasonable person is wired, it's just the reaction may be greater by [defendant]."

Defense counsel also argued: "And, again, just for the record even if you find that this provocation would not have been sufficient on a normal person, if it would have affected [defendant] differently because of the way his head is hot [sic ] wired, then you must still—it goes to deliberation of the first degree." He also told jurors: "Prosecution has not met its burden of proof of first degree murder. They cannot prove premeditation and deliberation. [Defendant's] brain, the information that he had isn't capable of premeditating or deliberating anything when he has the word that his momma is in danger. For someone to challenge [defendant], if he attempts to get into the house, he can't deliberate, he can't think about anything else except visiting his momma under these circumstances. You do not get first degree murder without premeditation and deliberation. The prosecution has not proven in any way, shape or form premeditation or deliberation was there, whatever." Defense counsel subsequently reiterated that premeditation and deliberation were not proven beyond a reasonable doubt, "not when you consider the brain of [defendant] and the hot [sic ] wiring."

The trial court instructed the jury on first degree murder as follows:

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

The trial court subsequently instructed, pursuant to CALCRIM No. 3428:

"You have heard evidence that the defendant may have suffered from a mental disorder. You may consider this evidence only for the limited purpose of

deciding whether at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: The specific intent to kill with malice aforethought. If the People have not met this burden, you must find the defendant not guilty of Count One, murder."

2. Analysis

A trial court has no *sua sponte* duty to give CALCRIM No. 3428. (*People v. Ervin* (2000) 22 Cal.4th 48, 91 (Ervin ) [discussing CALJIC No. 3.32, CALCRIM No. 3428's counterpart].) Although we do not know which party requested the instruction, defendant neither objected to its wording nor requested amplification or clarification. As a result, the Attorney General says, defendant's claim has been forfeited. (*See, e.g., People v. Lee* (2011) 51 Cal.4th 620, 638; *People v. Hudson, supra*, 38 Cal.4th at pp. 1011-1012; *People v. Young* (2005) 34 Cal.4th 1149, 1202-1203.) If CALCRIM No. 3428 told jurors they could consider mental disorder evidence only with respect to intent to kill, however, it would constitute an incorrect statement of the law, and the rule of forfeiture would not apply. (*People v. Hudson, supra*, 38 Cal.4th at p. 1012.) Moreover, the issue "would implicate the court's duty to give legally correct instructions. Even if the court has no *sua sponte* duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) Accordingly, we address defendant's claim on the merits.

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] [] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) "The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. [Citations.]" (*People v. Young, supra*, 34 Cal.4th at p. 1202.) And, we must assume the jurors are intelligent persons and capable of understanding and correlating all instructions given to them. (*People v. Guerra, supra*, 37 Cal.4th at pp. 1148-1149.)

"[I]f there is evidence from a qualified expert the defendant suffered from a mental disease, defect or disorder at the time of the crime ... the particular mental disease, defect or disorder becomes a matter for the jury to consider as that fact finder believes appropriate in deciding whether the defendant acted with the required mental state." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830 (*Larsen* ).) The first paragraph of CALCRIM No. 3428, as given in the present case, so informed the jury. The trial court was not required to identify premeditation and deliberation as a mental state to which evidence of mental disorder was relevant, given that it had already explained premeditation and deliberation were mental states necessary for a conviction of first degree murder. (*People v. Rogers, supra*, 39 Cal.4th at p. 881.)

The question is whether the second paragraph of the instruction erroneously conveyed that mental disorder evidence could not be considered with respect to

premeditation and deliberation, but instead was limited to the issue of specific intent to kill. We conclude that although it might be so interpreted, considered in isolation, the instructions as a whole and defense counsel's argument to the jury made it clear jurors were free to consider mental disorder evidence in determining whether defendant deliberated and premeditated, as well as in determining whether he specifically intended to kill. (*See People v. Rogers, supra*, 39 Cal.4th at pp. 881-882; *People v. Castillo, supra*, 16 Cal.4th at pp. 1015-1017; *cf. People v. Wade* (1988) 44 Cal.3d 975, 994-995.) As we previously observed, jurors were told to consider all the instructions together. The record neither contains any inquiries from them regarding the application of the instructions nor suggests any confusion on their part. (*See People v. Young, supra*, 34 Cal.4th at p. 1203.) Moreover, defendant's arguments to the contrary notwithstanding, there was strong evidence of premeditation. Under the circumstances, it is not reasonably probable the jury would have reached a different verdict had the court expressly included premeditation and deliberation in CALCRIM No. 3428. (*See Ervin, supra*, 22 Cal.4th at p. 91; *Larsen, supra*, 205 Cal.App.4th at pp. 829-831.)

Defendant argues there is a difference between not giving the instruction at all, as was the situation in *Ervin* and *Larsen*, and giving an erroneous version thereof. He points out his defense was predicated on evidence that due to his background and mental disorder, he reacted impulsively during his confrontation with Johnson. He claims the instructional error should be assessed under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman* ), not the less stringent standard for state law error of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson* ), because, "[a]lthough the erroneous instruction did not remove the element of deliberation and premeditation from jury consideration, the instruction effectively did so by eliminating consideration of [defendant's] mental disorder evidence as to this issue."

It is settled that "instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480.) Additionally, error in giving conflicting instructions on the intent or mental state element required to sustain a guilty verdict is assessed under the *Chapman* standard (*People v. Lee* (1987) 43 Cal.3d 666, 668-669), as is instructional error that improperly describes or omits an element of the offense (*Larsen, supra*, 205 Cal.App.4th at p. 829 & cases cited).

These situations do not exist here, however. "CALCRIM No. 3428 does not delineate or describe an element of an offense. Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case. [Citation.]" (*Larsen, supra*, 205 Cal.App.4th at p. 830.) As worded, CALCRIM No. 3428 neither removed from the jury's consideration nor misstated the intent or mental state elements of the offense. (*See Larsen, supra*, at p. 830.) The elements of murder, and requirement and definition of premeditation and deliberation, were fully set out in other instructions. The instructions as a whole and defense counsel's argument made it clear that jurors could consider defendant's mental disorder evidence on the issue of premeditation and deliberation, as well as intent. Any error was not of federal constitutional magnitude.

1

2   *Hosley*, 2014 WL 2112698, at *21-24.

3              2. *Ground 4: CALCRIM No. 3428 - Analysis*

4          Hosley contends that the language of CALCRIM No. 3428 foreclosed the jury from

5   considering mental-disorder evidence with respect to premeditation and deliberation. ECF No.

6   1 at 34-35. He argues that mental-disorder evidence was also relevant to the issue of

7   deliberation and premeditation and that his constitutional right to a fair trial was violated due to

8   the trial court's failure to instruct the jury properly. *See id.* We do not agree.

9          The jury instruction at issue, CALCRIM No. 3428, states:

10              "You have heard evidence that the defendant may have suffered from a
    mental disorder. You may consider this evidence only for the limited purpose of
11          deciding whether at the time of the charged crime, the defendant acted with the
    intent or mental state required for that crime.
12              "The People have the burden of proving beyond a reasonable doubt that the
    defendant acted with the required intent or mental state, specifically: The specific
13          intent to kill with malice aforethought. If the People have not met this burden,
    you must find the defendant not guilty of Count One, murder."
14

15

16  *Id*. at *22.

17         In the first paragraph, the instruction states that the jury may consider evidence of the

18  mental disorder in deciding whether "the defendant acted with the intent or mental state

19  required for that crime." *Id*. The second paragraph of CALCRIM No. 3428 states that the

20  prosecution has the burden of proving "the defendant acted with the required intent or mental

21  state, specifically: The specific intent to kill with malice aforethought." *Id*. The elements of

22  murder, including the requirement and definition of premeditation and deliberation, were fully

23  set out in other instructions. *See id*. at *24. Thus, CALCRIM No. 3428 merely requires the

24  jury to cross-reference the instructions containing the elements of murder and the definition of

25  premeditation and deliberation. We do not consider that task to be unduly confusing or

26  ambiguous. The plain language of the instruction did not foreclose the jury from considering

27  mental-disorder evidence relating to premeditation and deliberation, as Hosley suggests.

28

                                          30

The California Court of Appeal reasonably rejected Hosley's argument in ground 4, concluding that "CALCRIM No. 3428 neither removed from the jury's consideration nor misstated the intent or mental state elements of the offense." *See Hosley*, 2014 WL 2112698, at *24. The California Court of Appeal further noted that there was strong evidence of premeditation, and it was not "reasonably probable the jury would have reached a different verdict had the court expressly included premeditation and deliberation in CALCRIM No. 3428." *Id*. We agree and will recommend that habeas relief be denied as to ground 4 of the petition.

### 3. Ground 5: CALCRIM No. 225 - Background

In denying the instructional error claim in ground 5 of the petition concerning CALCRIM No. 225, the California Court of Appeal stated:

> **A. CALCRIM No. 225**
>
> Defendant contends the trial court erred by failing to include the mental state of deliberation and premeditation in CALCRIM No. 225. Due to the omission, he says, "a reasonable juror would not have thought that the 'reasonable theory of innocence' principle applied to premeditation and deliberation."
>
> 1. Background
>
> As previously described, the prosecution proceeded on a theory that the homicide was willful, deliberate, and premeditated, and, accordingly, first degree murder. Defense counsel asserted the killing was, at the very least, a lesser crime. In part, defense counsel argued that even ordinarily prudent people would have their ability to deliberate affected by trying to find out if a loved one had been hurt, and that such provocation would have affected defendant differently "because of the way his head [was] hot [sic ] wired...."
>
> In its instructions, the trial court defined direct and circumstantial evidence pursuant to CALCRIM No. 223, and told jurors both were acceptable types of evidence, neither was entitled to greater weight than the other, and jurors had to decide whether a fact in issue had been proved based on all the evidence. Pursuant to CALCRIM No. 224, the trial court next instructed:
>
> "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.
>
> "Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept

the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

This instruction was immediately followed by CALCRIM No. 225, to wit:

"The People must prove not only that the defendant did the act charged, but also that he acted with a particular intent.  The instruction for the crime explains the intent required.

"An intent may be proved by circumstantial evidence.

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent, and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

2. Analysis

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171-1172, the California Court of Appeal explained:

"The trial court is required to instruct the jury on the general principles of law relevant to the issues raised by the evidence.  [Citation.]  CALCRIM No. 224 states such a principle that must be given *sua sponte* on those occasions when it is applicable.  [Citations.] []  It is applicable only when the prosecution substantially relies on circumstantial evidence to establish any element of the case.  [Citations.] The instruction should not be given where circumstantial evidence is incidental to and corroborative of direct evidence.  [Citations.]

"CALCRIM No. 225 is to be used in place of CALCRIM No. 224 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.'  [Citations.] CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive.  [Citation.]"

Defendant says only CALCRIM No. 225 should have been given in the present case, because identity was not in issue and the determination of defendant's mental state depended largely on circumstantial evidence.  He concedes any error would have been harmless (or nonexistent) had only the more-inclusive CALCRIM No. 224 been given, but argues the trial court prejudicially misled the jury by giving both instructions while omitting mental state and/or deliberation and premeditation from CALCRIM No. 225.

The issue has not been preserved for appeal.  " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the

evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)  Defendant did not do so here.  Although the rule of forfeiture does not apply when the trial court gives an instruction that is an incorrect statement of the law (*Hudson, supra*, at p. 1012), such is not the situation here (*see People v. Livingston* (2012) 53 Cal.4th 1145, 1165).

In any event, defendant's claim of prejudicial error fails on the merits.  "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled.  [Citations.]" (*People v. Tate* (2010) 49 Cal.4th 635, 696; *see Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.)  In making this analysis, we presume jurors are intelligent persons who are capable of understanding, correlating, and applying all jury instructions given.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940; *People v. Guerra* (2006) 37 Cal.4th 1067, 1148, *disapproved on another ground in People v. Rundle* (2008) 43 Cal.4th 76, 151.)

CALCRIM No. 224, being the more inclusive of the two instructions, told jurors how to deal with circumstantial evidence as to any fact, including mental state.  (*See People v. Samaniego, supra*, 172 Cal.App.4th at p. 1172.)  Considered together, CALCRIM No. 225 at most emphasized the principles contained in CALCRIM No. 224 with respect to circumstantial evidence of intent.  Because jurors were told to consider all the instructions together, it is not reasonably likely they were misled, as defendant now claims, into believing the circumstantial evidence principles were inapplicable to deliberation and premeditation.  Accordingly, any error in giving both instructions or in modifying CALCRIM No. 225 so as to omit mental state, was harmless under any standard.  (*See, e.g., Estelle v. McGuire, supra*, 502 U.S. at p. 72; *People v. Thornton* (2007) 41 Cal.4th 391, 440-441; *People v. Rogers* (2006) 39 Cal.4th 826, 885-887; *People v. Samaniego, supra*,172 Cal.App.4th at p. 1172.)

*Hosley*, 2014 WL 2112698, at *18-21.

### 4.  *Ground 5: CALCRIM No. 225 - Analysis*

Respondent argues that Hosley's argument in ground 5 has not been preserved for appeal.

ECF No. 20 at 43.  A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).   This doctrine of procedural default is based on concerns of comity and federalism.  *See id*. at 730-32.  However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules.  Procedural default can only block a claim in federal court if the state court

"clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989).

We agree with respondent that the California Court of Appeal denied relief on ground 5 under a state law procedural ground independent of federal law and adequate to support the judgment. *Hosley*, 2014 WL 2112698, at *20 (concluding that "[t]he issue has not been preserved for appeal" because Hosley failed to request "appropriate clarifying or amplifying language" for the instruction and citing *People v. Hudson*, 38 Cal. 4th 1002, 1011, *as modified* (Aug. 23, 2006)). While this procedural rule does not apply when the trial court gives an instruction that is an incorrect statement of the law, *see Hudson*, 38 Cal. 4th at 1012, that was not the case here. Hosley argues that the trial court failed to include the mental state of deliberation and premeditation in CALCRIM No. 225, but another instruction, CALCRIM No. 224, was more expansive and properly instructed jury on the mental state of deliberation and premeditation.[5]

## C. Extra Security Guard

Hosley argues in ground 6 that his constitutional right to a fair trial was violated when the trial court decided to post an extra security guard near Hosley when he testified in addition to him being shackled. ECF No. 1 at 40-43. Respondent argues that ground 6 was reasonably rejected by the state courts and that there was no violation of due process. ECF No. 20 at 47.

"Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). In analyzing whether a defendant's constitutional right to a fair trial was

---

[5] Any error by Hosley's counsel with respect to this instruction was nonprejudicial and not a violation of Hosley's Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687-94 (1984) (holding that a defendant must affirmatively prove prejudice in an actual ineffectiveness claim alleging a deficiency in attorney performance).

violated by the use of excessive courtroom security measures, the reviewing court must "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Hayes v. Ayers*, 632 F.3d 500, 521 (9th Cir. 2011) (quoting *Holbrook*, 475 U.S. at 572). Prejudice is found where an "unacceptable risk is presented of impermissible factors coming into play in the jury's evaluation of the defendant." *Id*. (internal quotation marks omitted). If the security measures are not inherently prejudicial, the court considers whether the measures actually prejudiced the jury. *See id*. at 521-22.

### 1. Ground 6: Extra Security Guard - Background

In denying the prosecutorial misconduct claim in ground 6 of the petition concerning the posting of an extra security guard during Hosley's testimony, the California Court of Appeal stated:

> **Security Measures**
> Defendant complains that the trial court abused its discretion by positioning an extra bailiff near defendant while defendant testified, after already improperly requiring that defendant be shackled. Assuming the trial court erred, we conclude defendant has failed to demonstrate prejudice.
>
> A. Background
> By the time defendant took the stand, the jury had heard evidence defendant was arrested on September 18, 2008, after attempting to avoid police by jumping from a second-floor balcony and fleeing on foot. Although shot with a Taser to prevent him from fleeing further, defendant refused to comply with officers' demands that he show his hands, and he was tased again. He was then taken into custody. The jury had also learned several witnesses saw defendant be violent on different occasions; Crowder told Detective Owen that she was afraid of defendant and that, a few days after the shooting, defendant choked Crowder with a scarf until she blacked out; and Willoughby told Detective Grogan he was afraid of defendant and so was everyone he knew.
> Shortly before defendant testified, the following took place:
> "[THE COURT:] And as I indicated in chambers also, there's going to be additional security between the witness stand and the jurors. There are ... three jurors who are the alternates who are very close to the witness stand. We're in an adequate courthouse with an adequate courtroom, and as long as your client is going to be seated at the witness stand before the jury gets here, I am going to have my bailiff secure his legs.
> "[DEFENSE COUNSEL]: Your Honor, ... I am opposed to that. It is inappropriate to shackle a defendant when he is testifying or when he is in trial. It

gives a sense of—

"THE COURT: Security?

"[DEFENSE COUNSEL]: Well, it gives a sense of a need for security when he is testifying and that would indicate that the defendant—to the jurors that there's some reason for it.

"THE COURT: ... [T]he jurors aren't going to know. They're not going to see it. It can't be seen. They're not going to be the leg irons that are noisy. They're going to be the leg ties that are quiet.

"But just for the record, ... your client's charged with murder. Your client is also—there's been evidence that he jumped off a balcony in an apartment complex into a tree when he resisted the officers and he had to be tased, and there's been significant testimony regarding people being afraid of your client, and we've got 15 jurors here who have never been close to somebody who has been charged with murder and for their protection and the protection [of] the Court and the protection of the bailiffs in this room, he is going to have to be restrained.

"[DEFENSE COUNSEL]: I would strongly object to that, Your Honor. And I would also note that would be [a] due process objection under the United States as well as the California Constitution.

"THE COURT: Well, there is going to have to be levels of security. There's going to be a bailiff standing behind [defendant] and up against the wall, as well as his legs will be restrained with the ties.

"[DEFENSE COUNSEL]: I would object to ... that show of security, Your Honor. It's inappropriate.

"THE COURT: ... [I]t's appropriate for two reasons, and one is the jurors, believe me, are going to be very intimidated by having a witness, a defendant in a murder trial, right within arm['] s reach of them, and I guarantee you they are not going to listen to a word that he's saying. They're going to be intimidated if there is not at least a deputy standing behind, not only for each of the 15, but the court reporter and for my safety as well. And that will be outside the presence of the jury so they won't know. [¶] ... [¶]

"THE DEFENDANT: I will wear any chains. It don't matter. I don't care. Just don't cover my mouth. I don't care what chains I'm wearing. I am going to say what I am going to say."

After a recess, but before the jury returned to the courtroom, defense counsel stated his intention to call defendant as his next witness. Counsel noted defendant was already at the witness stand and wearing some form of shackles (albeit not metal ones), and there was an officer directly behind him. Counsel reiterated his belief the security measures constituted a denial of defendant's due process rights. The court responded: "And I stated to you that I think it's important that the jury feel safe under the circumstances. There's a bailiff sitting behind him, there's one at the other corner of the jury box." When the jurors returned to the courtroom, they were informed defendant had already been sworn in.

B. Analysis

"[T]he Fifth and Fourteenth Amendments [to the federal Constitution] prohibit the use of physical restraints visible to the jury absent a trial court

determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 629.)  Under state law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291, *fn. omitted; see also* § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].)  A defendant's record of violence does not by itself justify shackling.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 986; *People v. Duran, supra*, at p. 293; *but see People v. Medina* (1995) 11 Cal.4th 694, 730.)

"The decision of a trial court to shackle a defendant will be upheld by a reviewing court in the absence of an abuse of discretion.  [Citations.]  When the record does not reflect 'violence or a threat of violence or other nonconforming conduct' by the defendant, a trial court's order imposing physical restraints will be deemed to constitute an abuse of discretion.  [Citations.]" (*People v. Cunningham*, supra, 25 Cal.4th at p. 987.)  While the trial court must make its own independent determination of the need for physical restraints and may not rely solely on the judgment of court security personnel (*People v. Mar* (2002) 28 Cal.4th 1201, 1218; *People v. Hill, supra*, 17 Cal.4th at p. 841) or on "rumor and innuendo" (People v. Cox (1991) 53 Cal.3d 618, 652, *disapproved on another ground in People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22), "[t]he court [is] not obliged to hold a formal evidentiary hearing on the matter, but [can] base its determination on factual information properly brought to its attention. [Citation.]" (*People v. Medina, supra*, 11 Cal.4th at p. 731.)  "In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.'  [Citation.]  These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.  [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 367.)

In the present case, it appears the trial court made its own independent determination of the need for physical restraints.  However, the record fails to show the requisite " 'manifest need' " therefor.  The reasons given by the trial court were: (1) The alternate jurors were seated close to the witness stand; (2) Defendant was charged with murder; (3) The jurors had never been close to someone charged with murder; (4) Defendant attempted to escape from arresting officers; and (5) There was evidence at trial that people were afraid of defendant. Despite the fact defendant had been in custody some three years by the time of trial, however, there was no suggestion on the record that he had engaged in any violation of rules or orders or any violence once in custody, or was likely to disrupt the proceedings or engage in nonconforming behavior in the courtroom. The reasons stated by the court were insufficient to justify physical restraints in the jury's presence.  (*Compare People v. Seaton* (2001) 26 Cal.4th 598, 652 *with People v. Lomax* (2010) 49 Cal.4th 530, 559-560, 562; People v. Gamache, supra, 48 Cal.4th at pp. 368-370; *People v. Wallace* (2008) 44 Cal.4th 1032, 1049-1050; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032; *People v. Cunningham, supra*, 25 Cal.4th at pp. 987-988; *People v. Hawkins* (1995) 10 Cal.4th 920, 937,

943-944, *overruled on other grounds in People v. Lasko* (2000) 23 Cal.4th 101, 110 & People v. Blakeley (2000) 23 Cal.4th 82, 89; *People v. Pride* (1992) 3 Cal.4th 195, 231-233; *People v. Livaditis* (1992) 2 Cal.4th 759, 773-774; *People v. Sheldon* (1989) 48 Cal.3d 935, 945-946.)

We recognize a trial court is entitled to take a cautious approach in light of all the information before it, and is not required to wait until confronted with a violent or disruptive incident in front of the jury before ordering restraints. (*See People v. Pride, supra*, 3 Cal.4th at p. 233.) In addition, the decision to impose physical restraints need not be based on the conduct of the defendant at the time of trial. (*People v. Livaditis, supra*, 2 Cal.4th at p. 774.) In defendant's case, however, there was absolutely no evidence of violence or nonconforming conduct, or planned violence or nonconforming conduct, that "would disrupt the judicial process if unrestrained...." (*People v. Duran, supra*,16 Cal.3d at p. 293, fn. 11.) Accordingly, the trial court abused its discretion in ordering defendant physically restrained in the jury's presence. (*See People v. Seaton, supra*, 26 Cal.4th at p. 652.)

Defendant does not contend the erroneous shackling was itself prejudicial, since, as he acknowledges, the restraints were not visible to the jury. The California Supreme Court has consistently found unjustified shackling harmless under such circumstances. (*People v. Foster* (2010) 50 Cal.4th 1301, 1322; *People v. Anderson* (2001) 25 Cal.4th 543, 596.) Rather, defendant contends the trial court abused its discretion by posting extra security guards near defendant during his testimony, when defendant was already physically restrained.

"Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. [Citations.]" (*People v. Hernandez* (2011) 51 Cal.4th 733, 741-742 (*Hernandez* ).)

"[T]he stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need. [Citations.]" (*People v. Stevens* (2009) 47 Cal.4th 625, 633-634 (*Stevens* ).) Such security measures, which include the stationing of law enforcement officers in the courtroom and the presence of a uniformed deputy at the witness stand during a defendant's testimony, will be upheld "when based on proper exercises of discretion." (*Id*. at pp. 634, 638; *accord, Holbrook v. Flynn* (1986) 475 U.S. 560, 568-569; *People v. Marks* (2003) 31 Cal.4th 197, 224.) "Because security officers are now 'ordinary and expected' in the courtroom [citation], jurors may view the sight of an officer accompanying the defendant to the witness stand as nothing more than a routine measure. [Citations.] Although a deputy's presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the Supreme Court has made it clear that not 'every

practice tending to single out the accused from everyone else in the courtroom must be struck down.' [Citation.] 'Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance,' the high court stressed that it has 'never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.' [Citation.]" (*Stevens, supra*, 47 Cal.4th at p. 638, *quoting Holbrook v. Flynn, supra*, 475 U.S. at p. 567.) "[S]o long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings." (*Stevens, supra*, at p. 639, *fn. omitted.*)

"Although ... a heightened showing of manifest need is not required to justify the stationing of a security officer near the witness stand, the responsibility of the trial court remains the same. The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. [Citations.] Under *Holbrook* [*v. Flynn* ], *supra*, 475 U.S. at page 570, the trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury.... The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no *sua sponte* duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. [Citation.]" (*Stevens, supra*, 47 Cal.4th at p. 642.)

In the present case, the trial court exercised its own judgment, on a case-specific basis, when it ordered one court security officer to be stationed near the witness stand, and a second officer at the other corner of the jury box, while defendant testified. (*See Stevens, supra*,47 Cal.4th at p. 642.) The court expressed concern jurors might otherwise be intimidated by being so close to a person charged with murder, and so might not listen to defendant's testimony. These concerns were valid and based on the present case. (*Compare Stevens, supra*, 47 Cal.4th at pp. 642-643 *with Hernandez, supra*, 51 Cal.4th at p. 743.)

Depending on the circumstances, a trial court may properly order the use of more than one type of security measure. (*See, e.g., People v. Gamache, supra*, 48 Cal.4th at pp. 368-370.) We need not decide whether the trial court abused its discretion by doing so here, because defendant has not established prejudice.

In *Hernandez, supra*, 51 Cal.4th at page 746, the California Supreme Court determined that, because the stationing of a security officer at the witness stand during an accused's testimony is not an inherently prejudicial practice, a trial court's abuse of discretion in doing so does not rise to the level of a constitutional violation, but rather is an error of state law properly reviewed under *Watson, supra*, 46 Cal.2d at page 836. Employing that standard here, we conclude it is not reasonably probable defendant would have obtained a more favorable result absent the error, if error there was. Nothing in the record suggests the security

officer sat too close to defendant or acted in any way that might have been construed as expressing an opinion on defendant's testimony or credibility. (*See Hernandez, supra,* at p. 746.) Because defendant's leg restraints were not visible, jurors were unaware defendant was being subjected to doubly heightened security. They were aware from testimony at trial, however, that defendant had been violent in the past and some of the witnesses were afraid of him. Thus, the stationing of an officer at the witness stand and one at the other end of the jury box was not likely to give jurors any different or worse impression of defendant than the trial evidence. The security measures clearly did not affect the quality of defendant's testimony; the record shows he answered questions without hesitation or distraction, even at one point offering to help his attorney when counsel either was looking for something or trying to decide how to approach a subject. Moreover, the case against defendant was quite strong.

*Hosley*, 2014 WL 2112698, at *24-28.

### 2. Ground 6: Extra Security Guard - Analysis

Hosley's main contention with respect to the trial court's security measures is that the posting of extra security guards near Hosley during his testimony, when he was already physically restrained, violated his constitutional right to a fair trial.[6] *See id*. at *26. We agree with the California Court of Appeal, which held that the trial court provided a valid, case-specific reason— jurors might be intimidated by being so close to a person charged with murder and might not listen to defendant's testimony—for ordering one court security officer to be stationed near the witness stand and a second officer at the other corner of the jury box, while Hosley testified. *See id*. at *28. We further agree there was nothing in the record suggesting that the "security officer sat too close to defendant or acted in any way that might have been construed as expressing an opinion on defendant's testimony or credibility" or that the quality of Hosley's testimony was affected. *Id*. Because we agree that the trial court's posting of extra security guards during Hosley's testimony was not inherently or actually prejudicial, Hosley is not entitled to habeas relief on ground 6 of the petition. *See Hayes*, 632 F.3d at 521-22.

---

[6] While the California Court of Appeal concluded that restraining Hosley in shackles in the jury's presence was inappropriate, it held that any error was not prejudicial because the restraints were not visible to the jury. *See id*. at *26.

1

2      **D. Cumulative Error**

3          Hosley argues in ground 7 that his constitutional right to a fair trial was violated due to

4      the cumulative effect of the trial court's errors. ECF No. 1 at 44-46. Respondent argues that

5      Hosley's claim in ground 7 was reasonably rejected and that there was no violation of due

6      process. ECF No. 20 at 54. In denying the prosecutorial misconduct claim in ground 7 of the

7      petition concerning cumulative error, the California Court of Appeal stated:

8              Defendant says the errors in this case cumulatively prejudiced his
               Fourteenth Amendment right to a fair trial. We disagree. Although we have
9              found some errors and assumed others, none constitutes cause for reversal,
               whether considered singly or in conjunction with the others. (*See People v. Abel*
10             (2012) 53 Cal.4th 891, 936.) Defendant was not entitled to a perfect trial, only a
               fair one. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1009.) He received it.
11

12     *Hosley*, 2014 WL 2112698, at *28.

13         "The Supreme Court has clearly established that the combined effect of multiple trial

14     court errors violates due process where it renders the resulting criminal trial fundamentally

15     unfair[] . . . even where no single error rises to the level of a constitutional violation or would

16     independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing

17     *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3, 298, 302-03 (1973)). The Ninth Circuit has

18     "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry'

19     of otherwise harmless errors, such that they amplify each other in relation to a key contested

20     issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Parle*, 505

21     F.3d at 933). For example, in *Parle*, "all of the improperly excluded evidence . . . supported

22     Parle's defense that he lacked the requisite state of mind for first-degree murder; at the same

23     time, all of the erroneously admitted evidence . . . undermined Parle's defense and credibility

24     and bolstered the State's case." *Parle*, 505 F.3d at 930.

25         Here, Hosley argues that the errors identified in grounds 1-6 cumulatively denied him his

26     constitutional right to a fair trial by "lowering the prosecution's burden of proof, adding to the

27     prosecution's evidence, interfering with the proper evaluation of the evidence, and influencing

28

41

the jury to believe [Hosley] was violent and discount [his] defense." ECF No. 1 at 45. We agree that there were errors in Hosley's trial, but we cannot agree that the otherwise harmless errors amplified each other in relation to a key contested issue as in *Parle*. While the alleged errors in Hosley's trial went to whether he had the required state of mind for first-degree murder (grounds 1-5), we do not find this case to be analogous to *Parle* because the errors were not of sufficient magnitude to create a concern that there was a substantial and injurious effect or influence on the jury's verdict.

Accordingly, Hosley should be denied habeas relief on ground 7.

### E. *Marsden* Motion

Hosley argues in ground 8 that his constitutional right to a fair trial was violated when the trial court denied his post-verdict motion to substitute counsel under *People v. Marsden*, 2 Cal. 3d 118 (1970). ECF No. 1 at 46-48. Respondent argues that the trial court reasonably rejected Hosley's claim and that there was no violation of constitutional rights due to the alleged errors. ECF No. 20 at 55.

The ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated. *See Schell v. Witek*, 218 F.3d 1017, 1024-25 (9th Cir. 2000) (en banc). The Sixth Amendment guarantees effective assistance of counsel; it does not guarantee a "meaningful relationship" between an accused and his attorney. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). When a criminal defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. *See id*. at 1475-76; *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990). While a defendant has the right to make a motion for new counsel based on the defendant's perception of ineffective assistance of counsel, he does not have an automatic right to the substitution of counsel simply because he is dissatisfied with appointed counsel's performance. *See Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990). The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and therefore is properly considered in a habeas proceeding. *See Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 2000). The habeas court considers whether the trial

court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell*, 218 F.3d at 1026.

### 1. Ground 8: Marsden Motion - Background

In denying the *Marsden* motion claim in ground 8 of the petition, the California Court of Appeal stated:

**Postverdict Motion for Substitute Counsel**

Defendant contends the trial court abused its discretion by denying his postverdict request for substitute counsel to make a new trial motion. He says this case warranted appointment of substitute counsel "to evaluate a new trial motion based on counsel's performance with regard to the psychological evaluation he obtained." He asks us to remand his case for the appointment of new counsel to file a new trial motion. We find no error.

A. Background

The public defender's office was appointed to represent defendant at his initial arraignment on September 29, 2008. On January 26, 2009, defendant moved, pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), to have substitute counsel appointed. His motion was denied without prejudice to making it again after he had further opportunity to talk to counsel. On March 20, 2009, defendant renewed his motion, which was granted. New counsel was appointed, and it was this attorney who represented defendant through the remainder of the proceedings.

On March 24, 2011, defendant again made a *Marsden* motion. Before ruling, the court gave defendant and defense counsel the opportunity to speak together. When proceedings resumed, defense counsel declared a doubt as to defendant's competence (§ 1368) and criminal proceedings were suspended.

After defendant was found competent and proceedings were reinstated, the matter progressed to trial. As described in the statement of facts, *ante*, defendant presented expert testimony concerning his claimed mental disorders. In her cross-examination of Dr. Monroe, the prosecutor elicited that in reaching her diagnoses of defendant, Monroe did not administer any psychological tests, including for malingering. Monroe stated it was not her role to do testing. The prosecutor also elicited that Monroe did not assess defendant for Axis II personality disorders such as antisocial personality disorder. The prosecutor questioned Monroe at length concerning whether defendant met the diagnostic criteria for antisocial personality disorder and on the concept of malingering. In her summation to the

jury, the prosecutor attacked the validity of Monroe's diagnoses in part on the grounds Monroe relied on information that came from defendant, Harris, and defendant's brother, rather than also interviewing other people who had known defendant for a long time; she conducted no diagnostic testing to determine whether defendant's reported symptoms were real or to check for malingering; and she chose not to perform an analysis for antisocial personality disorder despite the fact defendant met the criteria therefor.

At the conclusion of the bifurcated court trial on defendant's prior convictions, defense counsel informed the court that defendant wished to make a *Marsden* motion. Defendant clarified he wanted time to hire his own attorney. The court suggested the *Marsden* motion was premature, and ultimately continued the matter several times to accommodate defendant.

On June 5, 2012, trial counsel was relieved and private counsel substituted in as the attorney of record. The matter was continued to June 19, 2012, in order to afford new counsel the opportunity to review the record, and with the understanding the case would be on calendar for the possible setting of a motion for new trial. On June 19, 2012, private counsel was relieved, because he had not in fact been retained and defendant did not have the financial ability to hire an attorney, and trial counsel was reappointed. Because counsel was not prepared to proceed, the case was continued to July 9, 2012.

On July 9, 2012, defendant made another *Marsden* motion. He asserted defense counsel "rushed" him to trial and sentencing, and "sabotaged" his case "with no complete evidence to defend" him. Defendant claimed he was receiving ineffective assistance of counsel, in pertinent part because defense counsel refused to file various motions defendant requested (including a motion for a new trial) and refused to give Monroe proper instructions to perform a full mental evaluation on defendant.

Counsel addressed the various issues raised by defendant, and mentioned that he filed several motions during the course of trial on issues he believed had merit. With respect specifically to Monroe, this took place:

"[DEFENSE COUNSEL:] My client was examined by a psychiatrist, actually, two psychiatrists, I believe, Your Honor, one pursuant to the motion to the 1368, and second, he was examined by Dr. Monroe.

"THE DEFENDANT: I was questioned, no test, just questions, interview questions, that's all. [¶] ... [¶]

"[DEFENSE COUNSEL]: That is what was done, and that is called a clinical evaluation by a psychologist.

"THE DEFENDANT: She didn't even make what I said was true, she just said what I told her. [¶] ... [¶]

"[DEFENSE COUNSEL]: And that is where—that was done, and, yes, I got feedback in that area. And what more needed to be done, I don't know."

After further discussion, the trial court opined defense counsel worked very hard on defendant's trial, filed a lot of motions, and was very sensitive to the medical issues defendant had at times. The court explained defense counsel was the attorney and was not required to file motions he did not believe had merit. The court acknowledged defendant's frustration with the process, but observed things such as what questions to ask witnesses were tactical decisions on counsel's part. The court found no grounds for granting defendant's *Marsden*

motion.

B. Analysis

The applicable rules are well settled. " ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.]  A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.]  The decision whether to grant a requested substitution is within the discretion of the trial court; appellate courts will not find an abuse of that discretion unless the failure to remove appointed counsel and appoint replacement counsel would 'substantially impair' the defendant's right to effective assistance of counsel.  [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 681, *italics added, disapproved on another ground in People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; *accord, People v. Taylor* (2010) 48 Cal.4th 574, 599; *Marsden, supra*, 2 Cal.3d at p. 123.)

The same standard applies whether the *Marsden* motion is made preconviction or postconviction.  (*People v. Smith* (1993) 6 Cal.4th 684, 694.)  " 'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request.  [Citations.]  If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant.  [Citation.]  If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial.  [Citations.]' [Citation.]" (*Id*. at pp. 692-693.)  Despite the use of the phrase "colorable claim," the California Supreme Court has made it clear that "[a] defendant has no greater right to substitute counsel at the [postconviction] stage than the [preconviction] stage]." (*Id*. at p. 694.)

"We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements.  [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 922.)  It is apparent from the record that defendant's claims of inadequate representation had their basis primarily in tactical disagreements between defendant and counsel.  Although Monroe's conducting a full psychological evaluation of defendant would have prevented the prosecutor from attacking her diagnoses and opinions based on her failure to test for malingering and to consider antisocial personality disorder, defense counsel was well aware of what a clinical evaluation entailed. Prosecutorial attack based on failure to test is weaker than prosecutorial argument based on an actual diagnosis of malingering or antisocial personality disorder.  Moreover, that counsel reasonably might have chosen a different tactic does not mean the tactic chosen was un reasonable and, accordingly, inadequate, especially where hindsight is involved.  (*See People v.*

*Jennings* (1991) 53 Cal.3d 334, 379-380.)

Defendant points to defense counsel's statement that he did not know what more needed to be done as having "exposed likely deficient performance in not requesting a complete evaluation of [defendant] and no acknowledgement that as a result of the incomplete evaluation, the prosecutor greatly attacked and weakened [defendant's] mental state defense." We do not read counsel's statement so literally, in light of its context. It is apparent to us (taking into account not only what was discussed at the *Marsden* hearing, but also the manner in which defense counsel presented and argued Monroe's testimony to the jury at trial) that counsel understood Monroe's opinions would be subject to attack, but presented them anyway because he believed they ultimately were favorable to defendant. (*See Beardslee v. Woodford* (9th Cir.2004) 358 F.3d 560, 583.)

Defendant observes that he was not required to establish ineffective assistance of counsel at the hearing on his motion; rather, he was only required to show that a failure to appoint substitute counsel would substantially impair his right to the assistance of counsel in making a motion for new trial. We agree defendant was not required to establish constitutionally inadequate representation at this stage. (*People v. Stewart* (1985) 171 Cal.App.3d 388, 395*, disapproved on another ground in People v. Smith, supra*,6 Cal.4th at p. 694.) He was, however, required to establish that a failure to replace defense counsel would substantially impair his right to the assistance of counsel. (*People v. Smith, supra*, at pp. 690-691.) It is not enough for a defendant merely to show trial counsel could have done something differently. "A series of attorneys presenting groundless claims of incompetence at public expense, often causing delays to allow substitute counsel to become acquainted with the case, benefits no one. The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing. This lies within the exercise of the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion." (*Id*. at p. 696.)

As for the possibility a reasonably competent trial attorney might have been concerned a complete psychological evaluation could reveal a more damaging diagnosis, defendant says this was not defense counsel's tactic, as shown by the fact counsel did not give this reason when explaining his conduct during the *Marsden* hearing. Although defense counsel did not expressly state he made a tactical decision in having Monroe perform a clinical rather than a full evaluation, we believe the tactical nature of his decision is implicit in what he said. Defendant further says that had a full evaluation been damaging, defense counsel would have had no obligation to turn over the evaluation to the prosecution and call Monroe as a witness (*see* § 1054.3, subd. (a)(1)), but could have obtained another evaluation. However, "[c]ompetent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion." (*People v. Williams* (1988) 44 Cal.3d 883, 945.) And, even if defense counsel could have obtained a favorable full evaluation, this does not mean his expert would have been impervious to prosecutorial attack, be it with regard to methodology, conclusions, or both. Moreover, under such circumstances the prosecution may well have insisted on having defendant examined and/or tested by its own expert (§ 1054.3, subd. (b); *Sharp v. Superior Court* (2012) 54 Cal.4th 168, 171; *see* Evid.Code, § 730), which could have

46

adversely affected defendant's protections under the Fifth and Sixth Amendments (*see generally Maldonado v. Superior Court* (2012) 53 Cal.4th 1112).

To summarize, we conclude the trial court acted well within its discretion by denying defendant's *Marsden* motion.

*Hosley*, 2014 WL 2112698, at *28-32.

### 2. Ground 8: Marsden Motion - Analysis

In a post-verdict *Marsden* motion, Hosley argued that his trial attorney was ineffective for refusing to give Dr. Monroe proper instruction to do a full mental evaluation. ECF No. 1 at 47. The trial court denied the motion, explaining that it appeared that Hosley was merely disagreeing with his counsel's tactical decisions. *See Hosley*, 2014 WL 2112698, at *30. The California Court of Appeal agreed and explained that "counsel reasonably might have chosen a different tactic does not mean the tactic chosen was *un*reasonable and, accordingly, inadequate, especially where hindsight is involved." *Id*. at *31.

Hosley's Sixth Amendment right to effective assistance of counsel was not violated when the trial court denied the *Marsden* motion. Certain tactical decisions within a criminal trial are properly made by a lawyer, and a client's disapproval with the chosen tactical decision does not amount to a constitutional violation unless the attorney's representation is shown to be incompetent. *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (explaining that certain decisions that are committed to the judgment of the attorney and not the client). Here, the tactical decision concerning the Hosley's mental evaluation in his criminal trial was properly made by his attorney. Hosley has not demonstrated that a different tactical decision would have led to a different outcome. We agree with the California Court of Appeal's reasoning that a different course of action would not have necessarily lead to a different outcome because any course of action would have been subject to prosecutorial attack. *See id*. at *32.

Accordingly, we will recommend that the requested habeas relief in ground 8 be denied. *See* 28 U.S.C. § 2254(d).

**F. Certificate of Appealability**

Having found that Hosley is not entitled to habeas relief, the court now turns to the question of whether a certificate of appealability should issue. *See* Rules Governing Section 2254 Cases, Rule 11. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *See Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from-
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a habeas petition on the merits, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the court finds that reasonable jurists would not find the court's determination that Hosley's federal habeas corpus petition should be denied debatable or wrong, or that the issues presented are deserving of encouragement to proceed further.  Hosley has not made the required substantial showing of the denial of a constitutional right. Therefore, the court recommends declining to issue a certificate of appealability.

## V.    CONCLUSION AND RECOMMENDATIONS

Accordingly, the court hereby recommends that:

1.  the petition for a writ of habeas corpus, ECF No. 1, be denied;

2.  the court decline to issue a certificate of appealability; and

3.  the clerk of court be directed to close the case.

These findings and recommendations will be submitted to the U.S. district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days of service of these findings and recommendations, plaintiff may file written objections with the court.  If plaintiff files such objections, he should do so in a document captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *See Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    October 29, 2018

_____
UNITED STATES MAGISTRATE JUDGE